IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MERYL SQUIRES-CANNON; | ) | |
| RICHARD KIRK CANNON; | ) | |
| ROYALTY PROPERTIES, LLC; and | ) | Case No.:  14-CV-5611 |
| CANNON SQUIRES PROPERTIES, LLC; | ) | |
|     Plaintiffs, | ) | |
|   v. | ) | |
| | ) | Judge:     Honorable Sara L. Ellis |
| FOREST PRESERVE DISTRICT OF | ) | |
| COOK COUNTY, ILLINOIS; | ) | Magistrate:  Honorable Maria Valdez |
| BMO HARRIS BANK, N.A.; | ) | |
| UNITED STATES OF AMERICA; | ) | |
| BAYVIEW LOAN SERVICING, LLC; | ) | |
| FRANCIS L. KELDERMANS; | ) | |
| McGINLEY PARTNERS, LLC; | ) | |
| ROBERT R. McGINLEY; and | ) | |
| DOES 1 through 15; | ) | |
|     Defendants. | ) | |

**PLAINTIFFS' MOTION FOR RELIEF FROM JUDGMENT
UNDER FEDERAL RULES OF CIVIL PROCEDURE
RULE 59(e) AND RULE 60(b)**

NOW COME Plaintiffs, by and through their undersigned attorneys, and respectfully move this Honorable Court *For Relief From Judgment Under Federal Rules of Civil Procedure, Rule 59(e) and Rule 60(b)*, which Judgment, Opinion and Orders (Docket 80-82) dismissed all of Plaintiffs' claims set forth in their Second Amended Complaint ("SAC", Docket 60), and in support thereof do hereby state as follows:

**COMPLIANCE WITH MEET AND CONFER REQUIREMENT**

Opposing counsel were contacted and provided a copy hereof for review, who informed the undersigned that they intend to oppose this Motion.

## I. GROUNDS FOR RELIEF

### A. Grounds For Relief Under Rule 59(e), Federal Rules of Civil Procedure

As stated by the court in *United States Labor Party v. Oremus,* 619 F.2d 683, 687 (7th Cir. 1980), "a Rule 59(e) motion to alter or amend a judgment properly may be used to ask a district court to reconsider its judgment and correct errors of law." Plaintiffs move, in part, for amendment under Rule 59(e) of the judgment granted herein.

A motion for amendment under Rule 59(e) "is appropriate where the court has misapprehended the facts, a party's position, or the controlling law." *Servants of the Paraciete v. Does*, 204 F.3d 1005, 112 (10th Cir. 2000). Accord: *Figgie Intern'l, Inc. v. Miller*, 966 F.2d 1178, 1180, 23 Fed.R.Serv.3d 149 (7th Cir. 1992). As to misapprehension of controlling law, the court in *Hickory Farms, Inc. v. Snackmasters, Inc.*, 509 F.Supp. 716, 719 (N.D. IL 2007), stated:

> "A court may grant a motion to amend a judgment if there is … an intervening change in the law or if the judgment reflects a manifest error of the law. *Cosgrove v. Bartolotta,* 150 F.3d 729, 732 (7th Cir. 1998). A "manifest error" is a "wholesale disregard, **misapplication, or failure to recognize controlling precedent**." *Otto v. Metro. Life Ins. Co.,* 224 F.3d 601, 606 (7th Cir. 2000). Reconsideration is appropriate, generally speaking, **when the Court overlooked or misunderstood something** …". (emphasis added)

As set forth below, Plaintiffs respectfully assert that the judgment granted herein is the result of all three (misapprehensions of the facts, of Plaintiffs' positions, and of controlling law), each one of which, individually, would require vacating the judgment of dismissal.

### B. Grounds For Relief Under Rule 60(b), Federal Rules of Civil Procedure

In the alternative, Plaintiffs move for relief from the judgment of dismissal pursuant to Rule 60(b)(1), 60(b)(4), and 60(b)(6), which state, in pertinent part:

> "On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:
> (1) mistake, inadvertence, surprise, or excusable neglect; …
> (4) the judgment is void; … or
> (6) any other reason that justifies relief."

Respectfully, each of the above reasons applies, and requires vacating the judgment of dismissal.

1

1. **Rule 60(b)(1)**

"Although earlier versions of this rule limited mistake to mistake of a party, the 1946 Amendment removed that restrictive qualification so that judicial mistakes are included within the scope of Rule 60(b). *See* Fed.R.Civ.P. 60(b) advisory committee notes; 7 Moore, Federal Practice ¶ 60.22[3], pg. 60–186." *Cashner v. Freedom Stores, Inc*., 98 F.3d 572, 576, 36 Fed.R.Serv.3d 660 (10th Cir. 1996). Accord: *Brandon v. Chicago Bd. Of Educ.*, 143 F.3d 293, 295, n.2, 40 Fed.R.Serv.3d 421 (7th Cir. 1998) ("The district court also acknowledged that Rule 60(b)(1) applies to errors by the court…"; "We agree with the district court that Rule 60(b)(1) is the appropriate mechanism for analyzing Brandon's request for relief.")

As stated by Chief Judge Castillo, in *Alexan v. Burke*, 62 F.Supp.3d 784, 788 (N.D. IL 2014):

> "**Rule 60(b)(1) encompasses mistakes by judicial officers as well as litigants.** *Brandon v. Chi. Bd. of Educ.,* 143 F.3d 293, 295 (7th Cir.1998) (citing *Wesco Prods. Co. v. Alloy Auto. Co.,* 880 F.2d 981, 984–85 (7th Cir.1989)). … The remedy is appropriate where "the [c]ourt has patently misunderstood the party, or has made a decision outside the adversarial issues presented to the [c]ourt by the parties, or has made an error not of reasoning but of apprehension." *Bank of Waunakee v. Rochester Cheese Sales, Inc.,* 906 F.2d 1185, 1191 (7th Cir.1990) (quoting *Above the Belt, Inc. v. Mel Bohannan Roofing, Inc.,* 99 F.R.D. 99, 101 (E.D.Va.1983)). **Once a proper showing of mistake, inadvertence, surprise or excusable neglect has been made by the movant, however, Rule 60(b) is to be liberally interpreted in favor of setting aside judgments**. *Smith v. Widman Trucking & Excavating, Inc.,* 627 F.2d 792, 795 (7th Cir.1980)." (emphasis added)

See also: *Universal Film Exchanges, Inc. v.* Lust, (3rd Cir. )[1]. Respectfully, several mistakes were made by this Court, misapprehending the positions taken by Plaintiffs as well as the controlling authorities, which mistakes require vacating the judgment of dismissal.

2. **Rule 60(b)(4)**

Where the court's ruling deprives a party of the right to discovery and a jury trial on disputed fact issues, that amounts to a violation of due process which renders the judgment void. As

---

[1] "The appellant, however, contends that where a movant possesses a meritorious [claim], doubt, if any, should be resolved in favor of granting the motion to set aside the judgment in order to permit the case to be resolved on its merits. *See, e. g*., *Tolson v. Hodge*, 411 F.2d 123 (4 Cir. 1969); *Tozer v. Charles A. Krause Milling Co*., 189 F.2d 242 (3 Cir. 1951). We do not disagree with this statement as a general proposition of law."

stated by the United States Supreme Court, in *United Student Aid Funds, Inc. v. Espinosa*, **559 U.S. 260, 271,** 130 S.Ct. 1367, 176 L.Ed.2d 158 (2010):

> "Rule 60(b)(4) applies only in the rare instance where a judgment is premised either on a certain type of jurisdictional error or on **a violation of due process that deprives a party of** notice or **the opportunity to be heard**. See *United States v. Boch Oldsmobile, Inc.,* 909 F.2d 657, 661 (C.A.1 1990); Moore's § 60.44[1][a]; 11 Charles A. Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice & Procedure § 2862, p. 331 (2d ed.1995 and Supp.2009); cf. *Chicot County Drainage Dist. v. Baxter State Bank,* 308 U.S. 371, 376, 60 S.Ct. 317, 84 L.Ed. 329 (1940); *Stoll v. Gottlieb,* 305 U.S. 165, 171-172, 59 S.Ct. 134, 83 L.Ed. 104 (1938)." (emphasis added)

See: *Wesco Products Co. v. Alloy Automotive Co*., 880 F.2d 981, 984, 14 Fed.R.Serv.3d 705 (1989), stating: "A void judgment for purposes of Rule 60(b)(4) is generally defined as a judgment entered by a court without jurisdiction or **in contravention of due process of law.** See *Margoles v. Johns,* 660 F.2d 291, 295 (7th Cir.1981), *cert. den.* 455 U.S. 909, 102 S.Ct. 1256, 71 L.Ed.2d 447 (1982)."

Plaintiffs respectfully submit that this Court's rulings included improper findings of fact, misapprehension of Plaintiffs' positions, and mistaken interpretations and application of controlling authorities, such that Plaintiffs were denied due process of discovery and a jury trial. Thus, the judgment of dismissal is void and should be set aside pursuant to Rule 60(b)(4).

## II. ARGUMENTS
### A. Takings Claims, And Related Conspiracy And Aiding And Abetting Claims, Should Not Have Been Dismissed

This Court was mistaken in its interpretation of the FPD's ordinance and its adoption motion which it simultaneously enacted on the same day, and their combined effect. This Court then, based on that mistaken interpretation, misapplied controlling authorities. <u>Each</u> of the controlling authorities cited in the Court's Opinion expressly or impliedly contemplated either just compensation paid to the land owners (determined either by agreement or by jury determinations of fair market value upon condemnation) or a value determined by free market forces at a public foreclosure sale unimpeded by government interference. Due to FPD's *government actions*, neither occurred in this instance.

3

The Court's interpretation was mistaken and contrary to actual facts. What the FPD did here was far more than just enact an ordinance which "… merely provides that, to the extent the FPD acquired Horizon Farm in the future, it would become part of a forest preserve." [Opinion, p.8] Instead, the ordinance which was passed and approved just two weeks prior to the scheduled foreclosure sale states its current and immediate effect of *requiring* the FPD to acquire the property at issue (and announces it to all prospective bid competitors):

> "Section 1. That a unified Forest Preserve be and the same is hereby created within the District that shall contain and connect lands now owned and lands to be acquired … **it is necessary and desirable** for the District to own and **it shall acquire** property hereinafter **described in Section 2** of this ordinance, for the purpose of creating a Forest Preserve …
>
> Section 2. That the lands referred to in Section 1 of this ordinance is more particularly described as follows: [**legal description of Horizon Farm, by itself, with no other land being included**] … known as: 311 Algonquin Road, Barrington Hills, Illinois 60010.
>
> Section 3. … **it being the intention** of … the District **to carry out the general plan provided in this ordinance** so far as legally and financially practicable, **and to** negotiate for purchases, **condemn, or otherwise acquire** from time to time **the several parcels of land described in Section 2** hereof and all right or interest therein.
>
> Section 4. This ordinance **shall be in full force and effect from and after its passage** and approval." (emphasis added) [SAC, EX3, pp.7-12]

That same day, the FPD Board simultaneously "moved [and unanimously approved] that the Proposed Land Acquisition be approved and adopted", specifically directing the FPD to bid up to the full amount of the judgment ["$20,445,561.08 (the "Judgment Amount") for the Subject Property"] at the already-scheduled impending foreclosure sale. [SAC, EX3, pp.30-35]

The FPD Board's coordinated simultaneous enactment and approval of the public ordinance and adoption motion (peculiarly governmental functions), in conjunction and coordination with the FPD's own controlled scheduling of a coercive foreclosure sale, was far more than just acting in its proprietary capacity the same as any other potential purchaser could do "through the same legal channels that any other individual would employ to assert such an interest", as required by *Klump v. United States*, 50 Fed.Cl. 268, 271 (Fed. Cl. 2001). What the FPD did was to enact an ordinance which unequivocally informed potential competitive bidders, just two weeks prior to the foreclosure

4

sale, that it *is* the FPD's authorized "**intention … to carry out the general plan [that "it is necessary and desirable for the District to own … and it *shall* acquire …" Horizon Farm]**, and that, to do so, it *was going to* "**condemn, or otherwise acquire … all right or interest therein**."[*Id*.]

In other words, the FPD enacted an ordinance (a peculiarly government function) which informed all other potential foreclosure bidders that, if the FPD did not acquire Horizon Farm at the scheduled foreclosure sale, it necessarily would acquire the property by **condemnation** or otherwise. That ordinance had immediate "full force and effect from its [October 1, 2013] passage and approval."[2] **No private purchaser had the power to exact such leverage and control against all other potential bidders at a foreclosure sale** – and the FPD was only able to do so by legislatively threatening use of its *governmental* power of condemnation. FPD's threats of condemnation in coordinated combination with its control over the coercive foreclosure sale involve, and constituted, government action taken in its sovereign capacity.[3] Plaintiffs did not anticipate, nor could they have reasonably anticipated, that the FPD would purchase the Note and foreclose upon it while *also* taking coordinated **legislative actions** (enacting an ordinance publicly announcing that it *shall* acquire the property through government condemnation) that would effectively preclude competitive bidding at the foreclosure auction under normal free market conditions.[4] This ***combination of coordinated***

---

[2] The FPD even went so far as to exacerbate the effects of its ordinance, in effectively precluding other bidders, by publicly announcing that it already owned the property. [Plaintiffs' Opposition to Defendants' Motions to Dismiss, Docket 73 at p.5]

[3] This Court mistakenly interpreted the *Baker* decision as indicating the Cannons had acknowledged FPD acquired the property *as a private party*. To the contrary, Cannons had only argued, in *Baker*, that the FPD acted as a private party in *purchasing the Note* – which they argued was by itself a separate and distinct act not authorized by FPD's enablement statute. It was FPD that tried to link up its Note purchase with its much-later successful foreclosure bid as being one continuous land-acquisition transaction, a position which the Cannons *disputed*. This Court misapprehended Plaintiffs' position in *Baker* and based its decision herein, in part, upon that **non-existing admission.**

[4] Since a foreclosure auction of the property was already scheduled to occur within less than two weeks, the only purpose for including the condemnation provision was to publicly announce the threat of condemnation if anyone outbid the FPD (to preclude competitive bids). That was *not* a "legitimate public purpose" for the condemnation provision being included in the ordinance.

*actions* by the FPD effected an unconstitutional taking, i.e. enactment of the government ordinance coupled with an already-scheduled foreclosure sale (FPD's already-existing "means of enforcement" - in forcing title transfer at auction while precluding other bidders). This is in direct contrast to the situation in *City of Chicago v. Loitz*, 329 N.E.2d 208, 211, 61 Ill.2d 92 (1975), where there was no existing means of enforcement of the prospective indefinite future plans of a possible future taking (which would have required condemnation and jury determination of value for just compensation).

Had the FPD only enacted an ordinance indicating an intention to potentially negotiate a *purchase* of the property from its owners, then of *A & D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1156 (Fed. Cir. 2014) might apply. That would have required an agreed determination of the fair market value of the property with which to provide just compensation to the owners. That did not occur in this already-pending coercive foreclosure which FPD controlled, where FPD, through coordinated timing of its <u>government action</u> threat of condemnation and public pronouncements of existing ownership, was assured of being the *only* bidder (with its directive to bid the full judgment amount approved that very same day), thus precluding any fair free-market compensation valuation and subjecting Plaintiffs to an artificial multi-million-dollar deficiency judgment.[5]

Similarly, *if* FPD had merely undertaken foreclosure solely in its private capacity as mortgagee, **without** enacting an ordinance announcing that it <u>fully intended to use its governmental powers to take the property by condemnation</u> if it was not the successful bidder at auction (precluding competitive bids), then *Lawndale Restoration Ltd. P'ship ex rel. Boulevard Realty Servs. Corp. v. U.S.*, 95 Fed.Cl. 498, 511-12 (Fed. Cl. 2010) might apply. However, that is not what occurred in this case, where a normal competitive bidding foreclosure sale under fair free-market forces was *precluded* <u>by FPD's government action</u>. Reliance on *Lawndale* and misapplication of its holding was manifest error.

---

[5] The FPD admitted, by its own ordinance authorizing FPD's bid, that the actual value was the full amount of the judgment on the Note ($20.5 Million), which is <u>$6 Million more</u> than its sole bid.

When Plaintiffs contracted with their lender, they voluntarily accepted the risk that, if they were for some reason unable to fully perform, the lender would be constrained by normal *private* free-market forces to either negotiate an agreed resolution or else effect a foreclosure <u>with a fair and open public bidding process</u>, where the lender would be solely motivated by its financial recovery. Plaintiffs also understood that the government could seek to purchase the property or, if an agreement could not be reached, obtain ownership through condemnation proceedings – either of which would still include and require an evaluation of the fair market value and just compensation paid to them. [*See Eckhoff v. Forest Pres. Dist. of Cook County,* 36 N.E.2d 245, 248-49, 377 Ill. 208 (1941), which specifically required a jury determination of property value and just compensation, and addressed the further issue of whether valuation of the property should be restricted to the time of the filing of the petition for condemnation despite depreciation which occurred during the delays in its filing (long after the ordinance announcing intent to do so was announced).]

What Plaintiffs did <u>*not*</u> contract for or anticipate or agree to, when borrowing the funds from a private lender to purchase their new residential property, was the use of unlimited taxpayer funds to purchase the note *and then enacting an ordinance which precluded competitive bidding* at the already-scheduled coercive foreclosure sale, thus subjecting Plaintiffs to an artificially low foreclosure sale millions of dollars below fair market value, and an artificially-created multi-million-dollar deficiency judgment. Further, had Plaintiffs contracted with the government (e.g. with an agreed government-backed loan), then they would have understood and agreed in advance to the potential government power and land-acquisition motivations which might attend such a government loan *foreclosure* – again, however, subject to free market forces on competitive bidding - but that is *not* what occurred in this instance. The effect of what occurred, by FPD's ***government action*** in enacting the ordinance in coordination with its coercive foreclosure, <u>***was***</u> an "interference with reasonable investment-backed expectations" of Plaintiffs, which constitutes an unconstitutional

7

regulatory taking. At the very least, it is a contested issue of fact which should have precluded this Court's dismissal without discovery and a jury trial.[6]

Proper interpretation of the government ordinance, and evaluation of its *effect*, **must** include consideration in context of: the coordinated timing of its enactment just prior to and in conjunction with the already-scheduled coercive foreclosure auction FPD controlled; the included unequivocal announcement that it shall take the property by condemnation if its foreclosure bid was not successful; and FPD's public statements that it already purchased and owns the property. All factors combined require a finding that enactment of the government ordinance, in coordinated combination with the government's coercive foreclosure actions, had major negative effect on Plaintiffs' reasonable investment-backed expectations, constituted a regulatory and government taking, and *preclude* this Court's erroneous finding that FPD was acting solely in its proprietary capacity throughout the foreclosure and auction process. The Court's factual finding was manifest error, since it was controverted by Plaintiffs' allegations in Count Two of the SAC, which specifically incorporated by reference the enactment of the ordinance and complained of the coordinated manipulative combination with the coercive foreclosure means of enforcement. Plaintiffs' factual allegations should have been taken as true and interpreted in a light most favorable to Plaintiffs, and thus should have precluded dismissal of the Takings and related Conspiracy and Aiding and Abetting claims.[7]

---

[6] Interpretation of the ordinance is a question of law, but its *effect* upon Plaintiffs under the totality of circumstances is a fact question to be determined by a jury.

[7] To survive a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss, Plaintiffs need only provide "enough detail to give the defendant fair notice of what the claim is and the grounds upon which it rests, and, through his allegations, show that it is plausible, rather than merely speculative, that he is entitled to relief." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1083 (7th Cir. 2008) (internal quotation marks omitted); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The court must "accept all the factual allegations in the complaint and draw all reasonable inferences from these facts in favor of the plaintiff." *Arazie v. Mullane*, 2 F.3d 1456, 1465 (7th Cir. 1993); *Anchor Bank, FSB v. Hofer*, 649 F3d 610, 614 (7th Cir, 2011).

Respectfully, this Court clearly erred in its application of the referenced authorities, and in its factual determination that the FPD acted solely "in its proprietary, and not sovereign, role throughout the process". The requested jury could reasonably find to the contrary, and the Court's judgment of dismissal was a violation of Plaintiffs' due process entitlement to discovery and jury trial. Plaintiff's Takings Claims (Counts I and II), and the related Conspiracy and Aiding and Abetting claims (Count III), should not have been dismissed, and the judgment of dismissal should be set aside as void.

### B. Fraud Claims, And Related Conspiracy And Aiding And Abetting Claims, Should Not Have Been Dismissed

This Court misapprehended Plaintiffs' positions regarding their reliance on the false representations and concealments of both Keldermans (under direction of FPD) and McGinley, and regarding the damages which were caused thereby. It also misconstrued and misapplied controlling authorities regarding the need to enter into a "transaction" in reliance, and regarding Keldermans' and McGinley's respective duties to disclose the true identity of the prospective "Purchaser".

Contrary to this Court's Opinion, at page14, controlling authority does *not* support the conclusion that "even if [Plaintiffs] engaged in discussions with Keldermans or McGinley, without entering into the transactions, Plaintiffs cannot claim that they relied on any misrepresentations or omissions made by Keldermans to McGinley to their detriment." This Court erred in its reliance upon *Reid v. Harvey Motorcycle & Camper*, No. 05 C 5375, 2007 WL 4277435, at *6 (N.D. Ill. Nov. 30, 2007), which does *not* require Plaintiffs to have entered into FPD's proposed "transaction" in reliance on the fraudulent statements.

Rather, *Reid* only holds, context of the facts of that case, that only the person who actually signed the contracts (Reid's fiancé, Picl) could establish damages from the contracts which were actually entered into in reliance upon the one and only claim for fraudulent

9

inducements to sign.[8] That is in stark contrast to the instant situation, where there were two separate and distinct claims of actions caused by induced reliance (Plaintiffs' confidential disclosures made to Keldermans, and Plaintiffs' inability to timely oppose FPD Board approval of the note purchase) with resulting damages alleged – neither of which depends upon entering into the "transaction" which Keldermans ultimately proposed. This Court has misapprehended Plaintiffs' positions and the controlling law.

One included claim, that alleged Plaintiffs' individual reliances, is that "Plaintiffs did sign the PNA [*Pre-Negotiation And Confidentiality Agreement*] and have subsequent confidential discussions with Keldermans about the Estate and ongoing litigation"[9] [SAC, para. 51], which PNA "Keldermans required the LLCs, and Cannons individually, to sign." [SAC, para. 48] The damages therefrom can only be quantified once Keldermans' notes, and his firm's subsequent use, of information disclosed by Plaintiffs during those confidential discussions are ascertained through discovery, since such matters are solely within his exclusive possession and his firm became counsel of record in the foreclosure case against Plaintiffs.[10]

The other included claim expressly alleges Plaintiffs' reliance on Keldermans' misrepresentations and omissions by the following:

---

[8] "The contract was entered into by Picl and Watson, and Reid was not a party to the allegedly fraudulent contract. Thus, the losses sustained as a result of Picl's reliance on Watson's fraudulent statement are Picl's alone. … To award separate damages to Reid, who has not alleged damages suffered solely by himself and independent of those suffered by Picl, risks a double penalty against Watson for the same transaction. Reid cannot show that he individually suffered proximate or actual damages as a result of Watson's actions that were independent of those suffered by Picl." *Id*., at *5.

[9] This Court is constrained to accept Plaintiffs' allegations (that they did sign the PNA) as true, and attaching an unsigned copy to the SAC herein (prior to discovery of the signed original from Keldermans) is not internally inconsistent with and does not "trump" their allegation, despite the manifest error of this Court's misinterpretation of the holding in *Alberian v. McDonald*, 617 F.3d 931, 933 (7th Cir. 2010). [Opinion, at page 14, footnote 11.]

[10] Identity of this "Purchaser" was material to Plaintiffs in determining whether they might be willing to negotiate a deal with them, and whether disclosure of private information to them might expose Plaintiffs to further difficulties in their ongoing litigation if no deal was reached. [SAC, para. 48]

> "Plaintiffs did rely upon Keldermans' false and misleading representations and concealments[11] to their individual detriment and damage - **separate and apart from the deal Keldermans proposed**." (emphasis added) [SAC, Para. 50]

> "Plaintiffs did rely upon Keldermans' false and misleading statements and concealments, which led them to believe that the "Purchaser" was a private party, **causing them to refrain from ascertaining the true identity of the FPD in time to address the matter to the Board in opposition of its approving** using taxpayer funds for the multi-million dollar Note purchase and involvement in protracted foreclosure litigation, and against their express wishes and steadfast opposition (known to FPD but not the Board) against the Estate becoming forest preserve." [SAC, Para. 51]

> "Plaintiffs were damaged by said false and misleading misrepresentations and active concealments. Once FPD had the option to purchase the Note, Harris could no longer negotiate any resolution with Plaintiffs, *even though Cannons offered the same amount FPD paid for the Note*. Harris, as a bank, was interested in recovery of its money, and did not have such an interest in title to the land as to refuse to accept the same amount from Cannons, or to reject reasonable repayment terms as were promised by Amcore. In contrast, FPD had only one agenda – to hopefully acquire title by foreclosure, and thus FPD refused to negotiate anything short of complete capitulation and immediate payment (of all principle, interest, penalties and legal fees). <u>Likelihood of opposing Board approval of the Note purchase</u> (risking millions in taxpayer funds and years of protracted litigation),[12] <u>and the amount of damage to Plaintiffs caused by the fraud, are questions of fact for the jury to decide</u>." (emphasis, footnote, and underlining in original) [SAC, para.52, footnote 15]

Respectfully, this Court misapprehended Plaintiffs' positions regarding Keldermans' fraudulent misrepresentations and concealments, and misinterpreted and misapplied controlling law.

Plaintiffs' claims for *Fraudulent Misrepresentations and Concealments as to Keldermans and FPD* (Count IV), and the related claims for *Conspiracy, and Aiding and Abetting, Keldermans Fraud* (Count V), adequately allege sufficient facts to give Defendants fair notice of what the claims are and the grounds upon they rest, and show that it is plausible that Plaintiffs are entitled to relief. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1083 (7th Cir. 2008). *See Ashcroft*

---

[11] Keldermans' ***duty to disclose*** was alleged in detail in para. 48, and footnote 13, of the SAC.

[12] *"During its approval process, Board members were concerned and inquired about the litigation, but FPD's in house attorney (Dennis White, who orchestrated the Note purchase) deceptively gave the Board a very slanted and incomplete report of the extent of all the litigation and of FPD's exposure. Had Plaintiffs been able to address the Board in a timely fashion [with the *truth* about the existing lawsuits], it is highly likely the Board would have elected not to pursue acquisition of the Estate unless and until the pending foreclosure litigation had been finally resolved, and Harris could then have [been able and encouraged to] accept the Cannons' identical offer and avoid further litigation. This was prevented by Keldermans' fraudulent misrepresentation and concealment."* [SAC p.20, fn. 15]

11

*v. Iqbal*, 556 U.S. 662, 678, 120 S.Ct. 1937, 137 L.Ed.2d 868 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010). All of the required elements for a plausible claim of fraud, and the required factual basis, were adequately alleged by Plaintiffs. [SAC, para. 47-52]

This Court mistakenly misapplied the holding of *Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 614 (7th Cir. 2013), when ruling that "[a]ny claimed damages were of Plaintiffs' own making, and their claims to have been harmed because they relied on the failure to identify the FPD as the purchaser of the mortgage fails." [Opinion, p.15] In contrast to *Cohen*, Plaintiffs do not challenge BMO's contractual rights under the Note to sell it – but, rather, they challenge the fraudulent process BMO and the other Defendants utilized to effectively preclude Plaintiffs from taking actions to resolve the litigation through purchasing the Note at the same price paid by FPD. Nothing in the Note authorizes BMO to collude with FPD to fraudulently misidentify the party which was to use Plaintiffs' tax dollars to compete with Plaintiffs for acquisition of the Note, and to prevent the FPD Board (and the public taxpayers) from a full and fair open hearing disclosure of all of the facts prior to authorizing the Note purchase.

The Court further misapprehended Plaintiffs' position, and improperly found that Plaintiffs' claimed damages were caused by Plaintiffs' own acts in not paying the loan according to its terms. The Court misapprehended Plaintiffs' position regarding the measure of and basis for their damages claim. Plaintiffs did not allege that FPD, by its fraudulent misidentification of the prospective purchaser, caused the loan to go into foreclosure. Whatever the cause of Plaintiffs' having to defend a foreclosure suit, their ability to <u>thereafter</u> *resolve* the pending litigation matter by settlement was thwarted **by FPD's fraudulent acts** which were aided and abetted by the other Defendants – thus causing their potential liability and damages to be *increased* by the amount of the difference between their likely settlement with BMO (after the

loan was already in foreclosure) and the full judgment amount sought by FPD, in addition to the further legal fees which Plaintiffs were forced to expend in continuing to defend the foreclosure action after the date of proposed settlement. Plaintiffs' alleged failure to pay the Note within one year after obtaining the loan, when the lender (BMO's predecessor) had promised to term it out over a long period, did not cause FPD's later fraudulent acts or the resulting increased damage caused by FPD's interference with Plaintiffs' attempts to negotiate a settlement. The mere fact that BMO *could*, under the terms of the Note, "sell the note to anyone without notice or consent", does not change the fact that Keldermans' and FPD's fraudulent misrepresentations interfered with Plaintiffs' negotiations and *prevented* Plaintiffs from thwarting FPD's use of their tax dollars to purchase the Note out from under them. The Court's finding regarding causation of Plaintiffs' claimed damages was the result of a misapprehension of Plaintiffs' position, and effected a denial of due process in having that fact issue tried by jury.

Thwarting that sale to FPD, if successful (a question of fact for the jury), would have left Plaintiffs as the *only* parties who could settle all of the pending litigation with BMO (over the Note, and the separate Line of Credit extended to Merix Pharmaceutical Corporation and included in the foreclosure action) and Plaintiffs were offering the exact same amount to BMO as FPD was offering. **Causation for Plaintiffs' increased damages is a question of fact for the jury to decide**, and Plaintiffs have alleged a plausible theory of recovery that should have precluded dismissal.[13] It was manifest error for this Court to find against Plaintiffs on that disputed issue at this stage of the proceedings, and to dismiss their Count IV and Count V.

---

[13] *Neitzke v. Williams,* 490 U.S. 319, 327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989) ("Rule 12(b)(6) does not countenance … dismissals based on a judge's belief of a complaint's factual allegations"); *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely").

The same arguments apply to the fraudulent misrepresentations and omissions by McGinley. [SAC para. 59-65] Once McGinley affirmatively misrepresented (falsely) that the proposed purchasers were a "group of neighbors", and was aware that the identity of the proposed purchasers was important to Plaintiffs, McGinley had an obligation to disclose the truth. McGinley did not just remain silent or refuse to disclose, but rather deliberately made false statements for the express purpose of misleading and preventing Plaintiffs from learning that FPD was involved - in time for Plaintiffs to challenge FPD Board's approval of that acquisition. Plaintiffs did rely upon McGinley's fraudulent misrepresentations and omissions to their detriment, as they were prevented from timely appearing before the FPD Board to oppose FPD acquisition of their note, which would have left them in the position of being the only parties capable of settling all of the existing litigation with BMO. The fact that McGinley *also* wanted to induce Plaintiffs to enter into a transaction with FPD, which did not occur, does not negate the fact that his fraudulent misrepresentations and omissions were intended to and did induce Plaintiffs to rely upon same and that increased damages were caused thereby. It was manifest error for this Court to misapprehend the controlling authorities to require that Plaintiffs enter into the FPD's intended transaction before McGinley's fraudulent statements and omissions could be actionable, while at the same time failing to recognize that Plaintiffs sufficiently alleged all required elements of plausible fraud claims based on McGinley's misrepresentation and omissions - separate and apart from any transaction McGinley or the FPD was contemplating. The Court's judgment of dismissal of Count Six was in violation of Plaintiffs' due process entitlement to discovery and a jury trial of their claims, thus requiring this Court to set aside the judgment as void.

### III. CONCLUSION

Pursuant to Rules 59(e) and 60(b)(1, 4, and 6), Plaintiffs have established their entitlement to relief from the judgment of dismissal as to each of their asserted claims, and based thereon respectfully request that the judgment of dismissal as to each be vacated and/or set aside as void.

DATED: June 6, 2016

                                      RESPECTFULLY SUBMITTED,

                                      /s/ Richard Kirk Cannon
                                    Richard Kirk Cannon
                                    Law Offices of Cannon &
                                    Associates 117 S. Cook St., #361
                                    Barrington, IL  60010-4311
                                    TEL:  (847) 381-1600
                                    FAX: (847) 381-6650
                                    EMAIL: rkcannon@cannoniplaw.com

                                    *Attorneys for Plaintiffs, and pro se*

## CERTIFICATE OF SERVICE

    I, Richard Kirk Cannon, caused to be served a copy of the foregoing document by filing same with the Clerk of the Court using the CM/ECF system which will send electronic notification of such filing to the all counsel of record.

                                      /s/ Richard Kirk Cannon